UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMECHI DANIEL,

                                    Plaintiff,

                    -v-

CITY OF NEW YORK,

                                    Defendant.

---

20 Civ. 11028 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Amechi Daniel, sues the City of New York (the "City"), alleging that he experienced discrimination, retaliation, and a hostile work environment due to his national origin, in connection with his employment in the City's Administration for Children's Services ("ACS").  He brings claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C §§ 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1983 ("Section 1983"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 *et seq.* ("NYCHRL").  The City has moved to dismiss Daniel's claims under Rule 12(b)(6) for failure to state a claim.  Dkt. 20.  For the reasons below, the Court grants the motion as to Daniel's claims under federal law, and declines to exercise supplemental jurisdiction over his remaining claims.

## I.    Background[1]

### A.  Factual Background

Daniel, who is of Nigerian origin, has worked for the City since October 26, 1998—and for ACS since September 4, 2006. SAC ¶¶ 11, 13. He is currently—and at all relevant times has been—employed as a Child Care Specialist Supervisor II in ACS's Legally Exempt Provider Unit (the "Unit"), a subdivision of the Child Care Operations Unit (which itself is a subdivision of the Child and Family Wellbeing ("CFWB") division). *Id.* ¶¶ 4, 8–9. The Unit investigates legally exempt childcare providers[2] and determines whether they are qualified to provide childcare. *Id.* ¶ 9. As a Child Care Specialist Supervisor II, Daniel is charged with reviewing reports and records in connection with homes' certifications and recertifications to determine whether they are in compliance with program regulations; answering inquiries regarding ongoing investigations into homes; determining and reviewing applicants' eligibility for ACS services under agency criteria and formulae; and "process[ing] providers who have attended training and receive an enhanced rate of compensation from ACS." *Id.* ¶¶ 18–19.

---

[1] This account draws primarily from the Second Amended Complaint, Dkt. 18 ("SAC") and the Equal Employment Opportunity Commission filing attached to Daniel's First Amended Complaint, Dkt. 15-1. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss . . . a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."); *Littlejohn v. City of New York*, 795 F.3d 297, 305 n.3 (2d Cir. 2015) ("In reviewing a Rule 12(b)(6) motion to dismiss, it is proper for this court to consider the plaintiff's relevant filings with the EEOC and other documents related to the plaintiff's claim, even if they are not attached to the complaint, so long as those filings are either incorporated by reference or are integral to and solely relied upon by the complaint.") (cleaned up). For the purpose of resolving the motion to dismiss, the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of the plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

[2] The SAC does not specify from what regimen these providers are exempt.

Daniel is one of four Child Care Specialist Supervisor IIs in the Unit. His Unit colleagues include a fellow Nigerian national—Olalekan Pedro—and two non-Nigerians—Natalie Barnette and Brigitte Grant. *Id.* ¶¶ 15, 17. The SAC alleges that all four Child Care Specialist Supervisor IIs took the same civil service examination together, have worked for ACS since September 4, 2006, "have the same evaluation," and, during the relevant time period, performed identical functions. *Id.* ¶¶ 16, 18. Devon Gayle supervised Daniel and his Unit colleagues during the relevant time period.

On an unspecified date in 2017, the Children's Center (the "Center")—a separate division within ACS—requested volunteers from other divisions to work overtime to compensate for a "massive shortage of workers to take care of children in its care." *Id.* ¶ 43. Daniel was "one of the initial employees" who responded to the request and began to pick up overtime shifts at the Center. *Id.* Gayle and Grant also "were granted overtime opportunities by the Children's Center." *Id.* ¶ 44. At an unspecified later date, Daniel stopped taking on overtime shifts at the Center "because the overtime pool was reduced as the backlog of cases became decongested." *Id.* ¶ 29. The SAC does not state whether, or if so why, other Unit members stopped taking on overtime shifts at the Center.

The SAC is also unclear on precisely who granted requests to work overtime shifts and when. Construing the SAC liberally, it appears that, at first, the "allocation of overtime at the [C]hildren's [C]enter" was not decided by anyone in Daniel's Unit. *Id.* ¶ 41. However, after the departure from ACS of a "Dr. Williams," who appears to have been in charge of allocating overtime shifts, "Gayle . . . took over the oversight of the overtime project." *Id.* ¶ 56. This change occurred on an unspecified date in 2017. *Id.* And, the SAC alleges, "that was when the favoritism and discrimination started." *Id.*

3

Generally speaking, the SAC alleges that Gayle denied Daniel overtime opportunities on the basis of his national origin, affording them instead to non-Nigerian Grant. *Id.* ¶¶ 20, 24, 31. Daniel claims that two other Nigerians at ACS, Daniel's Unit colleague Pedro and a "Mr. Karunwi" (whose job title is unclear), were also denied "the expansive overtime opportunities that . . . Gayle approved for . . . Grant." *Id.* ¶¶ 38–39. "On several occasions," the SAC alleges, "Gayle told [him] not to bother requesting overtime because it would be denied." *Id.* ¶ 33. These denials allegedly occurred "in 2017, 2018, and 2019," and resulted in Daniel's not obtaining $30,000 in overtime income, with adverse consequences for his future Social Security earnings and, because his pension plan contributions were lower, his pension. *Id.* ¶¶ 30–32, 56.

The SAC alleges, generally without specifics,[3] that Daniel "complained about" the allegedly discriminatory distribution of overtime shifts to Gayle "verbally on more than five occasions in 2017 and 2018, and during one-on-one meeting[s] and general unit meetings." *Id.* ¶ 56; *see also id.* ¶ 35 (alleging generally that Daniel "complained about discriminatory overtime, based on national origin, to Gayle on different occasions" and "telling Gayle that overtime should not be granted to staff in a way that disadvantages Nigerians because of nationality"). Gayle denied Daniel's accusations. *Id.* ¶ 56.

Sometime in June 2018, the Unit had a meeting with the "Associate Commissioner, Ms. Marie Phillippeaux, to discuss work and issues around it." *Id.* ¶ 46. There, Daniel questioned the "discriminatory overtime work" and criticized an unrelated job process as not fostering accountability. *Id.* ¶ 47. The next day, Gayle "denigrate[d]" Daniel's work and stated that he did the least amount of work in the Unit. *Id.* ¶ 48. Gayle also allegedly stated that Daniel "had

---

[3] Daniel does specify that he lodged one such complaint on March 18, 2018. SAC ¶ 36.

no right to speak about overtime discrimination and work assignment the way he did and if he continued he would be subject to discipline."[4] *Id.* "Not long after this incident," Daniel overheard Gayle "talking to someone about how he wished not to supervise the lazy and troublesome Africans[,] especially Amechi Daniel." *Id.* ¶ 51. The SAC alleges, without elaboration, that "[i]n several comments" above, "Gayle referred to [Daniel]'s national origin in remarks casting aspersion[s] on Nigerians and falsely indicting them among the work force for causing trouble." *Id.* ¶ 52. It further claims that at some point in spring 2019, Grant and Gayle "were talking about how Africans who are backward come to America and lay claim to rights they do not have in their countries of origin." *Id.* ¶ 55.

Sometime in October 2018, Gayle unveiled a new initiative that involved the monthly tracking of staff work, starting with data from August 2018. *Id.* ¶ 53. Daniel viewed this start date as "flawed," because he had taken three weeks' worth of vacation in August 2018, and therefore his performance that month would be unrepresentative. *Id.* When Daniel confronted Gayle with this view, Gayle responded that "only the Nigerians complained and he did not know why it is difficult to satisfy them." *Id.* ¶ 54.

Daniel continued to complain to Gayle about the allegedly discriminatory distribution of overtime shifts in 2019. That year, he lodged complaints on February 21, on an unspecified date in June, on July 18, on September 24, on an unspecified date in October, and on November 19. *Id.* ¶ 36. In the June complaint, Daniel "challenged th[e] ethnic distribution of overtime in the

---

[4] The SAC is unclear whether Gayle directed these alleged comments to Daniel. One paragraph states that "Gayle told Plaintiff" the comments in question. SAC ¶ 48. But the next paragraph states that Daniel "was out for [a] lunch break when Gayle started this tirade," but that Daniel nonetheless heard it because, upon Daniel's return to the office, Gayle "had his back turned to Plaintiff." *Id.* ¶ 49.

presence of another co-worker, Mr. Karinwi."[5] *Id.* ¶ 20.  In the October complaint, Daniel "had a discussion with Gayle regarding" the overtime distribution. *Id.* ¶ 22.  In the November 19 complaint, Daniel took issue not only with overtime shifts, but also with Gayle's instructing the "staff to move to a new location against the[ir] wishes," while allowing "Grant to remain and not move." *Id.* ¶ 34.

In response to Daniel's June 2019 complaint, Gayle told Daniel "that he does not discriminate and that it was the Nigerians at ACS that always complain about overtime and that the situation will not change to satisfy the Africans." *Id.* ¶ 21.  In response to the October 2019 complaint, Gayle instructed Daniel "to go to the [Equal Employment Opportunity Commission ("EEOC")] office if he wants" but that doing so "would be a waste of time." *Id.* ¶ 22.  And in response to the November 19, 2019 complaint, Gayle "reluctantly allow[ed] Grant to move" to a new location (apparently the new location to which other staff members had been moved), and told Daniel that "he does not understand why Nigerians are so persistent and causing confusion." *Id.* ¶ 34.

On December 4, 2019, Daniel filed a complaint with the EEOC for Gayle's allegedly discriminatory distribution of overtime opportunities "specifically for the period [from] January 1, 2019, to October 31, 2019, where . . . Gayle afforded only Ms. Brigitte Grant, for the most part, overtime opportunities for work relating to duties and function of the CFWB division." *Id.* ¶¶ 23, 40; *see also* Dkt. 15-1.[6]  During that period, the SAC alleges, Gayle denied 11 requests Daniel made for overtime work (two in February, four in April, three in May, and two in July).

---

[5] The Court understands "Mr. Karinwi" to be the same individual the SAC separately refers to as "Mr. Karunwi."

[6] Daniel's EEOC claim lists as the dates on which discrimination took place "06-03-2019" to "06-03-2019"; the SAC identifies a broader date range (January 1 to October 31, 2019).

SAC ¶ 59.  "Grant was however allowed to do overtime," Daniel states.  *Id.*  The SAC does not specify when or how often Grant received overtime opportunities.  Daniel's EEOC charge states that Grant was "given over-time at all times."  Dkt. 15-1 at 2.

 After Daniel brought the EEOC claim, Gayle allegedly "engaged in talking about him at the workplace in a manner that has diminished his character and professional standing among his co workers as he was portrayed in statements by Gayle as a disgruntled trouble maker because [he] made [an] EEO[C] complaint."  SAC ¶ 60.  The SAC also claims that in December 2019, Daniel "ended up in the emergency room from work . . . due to the discriminatory abuse from Gayle."  *Id.* ¶ 37.  Finally, the SAC alleges, on February 3, 2021, Gayle called a Unit meeting (which only Daniel and Grant attended) at which the opportunity for additional overtime shifts was discussed, and Gayle stated that he would send an email requesting confirmation of any Unit member's interest in such work.  Shortly after the meeting ended, however, "Gayle denied [Daniel] the opportunity to do the overtime."  *Id.* ¶ 62.

### B. Procedural Background

 On December 29, 2020, Daniel filed his original complaint.  Dkt. 1.  On May 12, 2021, Daniel filed a first amended complaint.  Dkt. 9.  On July 12, 2021, the City filed a motion to dismiss.  Dkt. 14.  On July 13, 2021, the Court ordered Daniel to file an amended complaint or oppose the motion to dismiss.  Dkt. 17.

 On August 3, 2021, Daniel filed the SAC.  Dkt. 18.  On August 24, 2021, the City filed a motion to dismiss, Dkt. 20, and a memorandum of law in support, Dkt. 22 ("Mot.").  On September 23, 2021, Daniel filed a memorandum of law in opposition.  Dkt. 25 ("Opp'n").  On September 29, 2021, the City filed a reply.  Dkt. 26.

## II.     Legal Standards Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145. That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.     Discussion

The SAC brings three sets of claims:  (1) for discrimination, under Title VII, the NYSHRL, and the NYCHRL; (2) for retaliation, under the same three statutes; and (3) for hostile work environment, under the NYSHRL and the NYCHRL.[7] The Court first addresses the City's

---

[7] Daniel has withdrawn his hostile work environment claim under Title VII because he did not include that claim in his EEOC charge and thereby failed to exhaust his administrative remedies as to that claim as required before bringing suit in federal court. *See* Opp'n at 2; *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006). To the extent the SAC may be read to bring a claim based on the factual allegation that Gayle denied Daniel an overtime opportunity after their February 3, 2021 call (SAC ¶ 62), such a claim also does not appear in the EEOC charge.

Relatedly, Daniel appears to have abandoned the claim the SAC brought under 42 U.S.C. § 1983 against the City, as he has not addressed the City's argument that the SAC does not adequately plead a *Monell* claim. *See Gonzalez v. City of New York*, 442 F. Supp. 3d 665, 684 (S.D.N.Y. 2020), *aff'd*, 845 F. App'x 11 (2d Cir. 2021) ("Gonzalez abandoned these [*Monell*] claims because he did not address Defendants' arguments for summary judgment in his opposition.");

argument that aspects of the SAC's claims are untimely and then considers the City's other challenges under Rule 12(b)(6).

### A. Timeliness

The City makes two arguments as to untimeliness. First, noting Title VII's requirement that a plaintiff file a charge of discrimination within 300 days of an allegedly discriminatory act's occurrence for it to be actionable, *see* 42 U.S.C. § 2000e-5(e), the City argues that Daniel cannot rely on any such act occurring before February 4, 2019 (300 days before Daniel filed his EEOC charge). Second, noting the three-year limitations period under the NYSHRL and the NYCHRL, *Morrison v. N.Y.C. Police Dep't*, 625 N.Y.S.2d 174 (N.Y. App. Div. 1st Dep't 1995) (NYSHRL); N.Y.C. Admin. Code § 8-502(d) (NYCHRL), the City argues that any claims arising before December 29, 2017 (three years before Daniel initiated this action) are time-barred.

In response, Daniel notes, as to his discrimination and retaliation claims, that evidence of acts outside the limitation period can be received as background evidence in support of timely claims. *See* Opp'n at 10 (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) ("Relevant

---

*Williams v. Mirabal*, No. 11 Civ. 336 (JF), 2013 WL 174187, at *2 (S.D.N.Y. Jan. 16, 2013) ("A court 'may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.'") (quoting *Lipton v. Cnty. of Orange, N.Y.*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004); *see also Robinson v. Fischer*, No. 09 Civ. 8882 (LAK) (AJP), 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010) (collecting cases), *report and recommendation adopted*, 09 Civ. 8882 Dkt. 51 (Jan. 18, 2011); *Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 907 n.11 (S.D.N.Y.) ("[T]he failure to provide argument on a point at issue constitutes abandonment of the issue . . . which provides an independent basis for dismissal."), *aff'd*, 130 F.3d 1101 (2d Cir. 1997). In all events, substantially for the reasons set out by the City, the SAC fails to adequately plead a *Monell* claim.

background evidence, such as statements by a decisionmaker or earlier decisions typifying the retaliation involved, may be considered to assess liability on the timely alleged act.")).

As to the discrimination and retaliation claims, both parties are correct. The defense is correct that conduct predating February 4, 2019 is untimely under Title VII as a basis for liability, and that conduct predating December 29, 2017 is similarly untimely under the NYSHRL and NYCHRL. Daniel is correct that such acts are potentially admissible as, *inter alia*, background evidence at a trial on claims involving conduct within the limitations period. Here, Daniel has alleged acts both before and after February 4, 2019, and potentially—although the undated nature of certain allegations complicates this assessment—before December 29, 2017. Those occurring after February 4, 2019—*i.e.*, within the limitations period for all claims—include, as alleged, nine instances in which Gayle denied Daniel overtime, SAC ¶ 59; Gayle's decision to move Daniel's worksite (but not Grant's) against Daniel's wishes, *id.* ¶ 34; and statements Gayle made in response to Daniel's June, October, and November 2019 complaints, and to his December 2019 EEOC filing, which Daniel perceived to be abusive and motivated by ethnic discrimination, *id.* ¶¶ 21–22, 34, 60. Those occurring before February 4, 2019—albeit broadly pled and often without an accompanying date—include acts by Gayle of discrimination against Daniel on the basis of national origin. For the purposes of this decision, the Court will therefore consider all conduct pled in the SAC as potentially having evidentiary significance, while mindful that under Title VII, conduct must postdate February 4, 2019, and under the NYSHRL and NYCHRL must postdate December 29, 2017, to be the basis for liability.

As to his hostile work environment claims, Daniel invokes the continuing violations doctrine, under which an employer may be liable for incidents amounting to a hostile work

environment so long as one such incident falls within the limitations period. *See Davis-Garett*, 921 F.3d at 42; *McGullam*, 609 F.3d at 75 (because hostile work environment claims by their "very nature involve[] repeated conduct, . . . . consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period"). The Court, however, does not have occasion to apply that doctrine here, because, with the dismissal of all federal claims, the Court declines to exercise supplemental jurisdiction over Daniel's claims under state and city law.

## B. Discrimination Claims Under Title VII

### 1. Applicable Legal Principles

Discrimination claims under Title VII are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015). The plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). To do so, the plaintiff must show that "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Holcomb*, 521 F.3d at 138). The burden of establishing a *prima facie* case in an employment discrimination case is "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019).

At the motion to dismiss stage, however, a plaintiff "is not required to plead a *prima facie* case under *McDonnell Douglas*." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72,

84 (2d Cir. 2015); *see also Forkin v. Loc. 804 Union (IBT)*, 394 F. Supp. 3d 287, 307 (E.D.N.Y. 2019) ("At the pleading stage, . . . a plaintiff need not prove discrimination or even allege facts establishing every element of the *McDonnell Douglas prima facie* case."). Instead, "[t]he facts alleged must give plausible support to the reduced requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation." *Littlejohn*, 795 F.3d at 311.

For employment discrimination claims under Title VII, a plaintiff must "plausibly allege that (1) the employer took adverse action against him and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega*, 801 F.3d at 86; *see Zoulas v. N.Y.C. Dep't of Educ.*, 400 F. Supp. 3d 25, 51 (S.D.N.Y. 2019). A plaintiff may satisfy this standard by "alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Vega*, 801 F.3d at 87. In short, the complaint must plead facts that provide "at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn*, 795 F.3d at 311; *but cf. Lively v. WAFRA Investment Advisory Group, Inc.*, 6 F.4th 293, 303 & n.5 (2d Cir. 2021) (noting holding in *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009 (2020) that but-for causation standard for discrimination claims applies both at trial and at the pleading stage but assuming *arguendo* that Title VII's comparatively "more lenient [motivating factor] standard . . . remains appropriate after *Comcast*").

## 2. Application

Daniel's claim of actionable disparate treatment is based on the theory that Gayle denied his overtime requests based on his national origin. The City assumes *arguendo* that the denial of overtime can qualify as an adverse employment action. Opp'n at 14. The issue then, under Title

VII, is whether the SAC adequately pleads that a motivating factor for those denials was Gayle's discriminatory intent.

An inference of a discriminatory motivation may arise from circumstances including, but not limited to, an employer's (1) criticism of the employee's performance in ethnically degrading terms, (2) invidious comments about others in the employee's protected group, and (3) favorable treatment of employees not in the protected group. *See Littlejohn*, 795 F.3d at 312–13. Where a plaintiff alleges invidious comments, the significance of those comments depends on the context in which they were made and whether, fairly considered, they reveal discrimination or "tend[] to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." *Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 116 (2d Cir. 2007), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Courts decline to find an inference of discrimination absent some evident contextual link to a protected characteristic. *See, e.g.*, *Williams v. Time Warner Inc.*, 440 F. App'x 7, 9–10 (2d Cir. 2011) (summary order).

Here, in pursuing an inference of discriminatory motivation, Daniel relies on Gayle's comments and allegedly favorable treatment of an ostensibly similarly situated employee, Grant. Neither set of allegations plausibly alleges discriminatory intent.

### a.   Gayle's Comments

The Court first puts aside as ill-pled the SAC's general allegations to the effect that Gayle "cast[] aspersion[s] on Nigerians," "falsely indict[ed] them among the work force for causing trouble," and "engag[ed] in talking about [Daniel] at the workplace in a manner that has diminished his character and professional standing among his co workers." *See* SAC ¶¶ 52, 60. Lacking any detail, those claims are too vague and conclusory to evince Gayle's discriminatory animus, let alone that this animus motivated the denial of Daniel's overtime requests. *See Offor*

*v. Mercy Med. Ctr.*, 167 F. Supp. 3d 414, 432 (E.D.N.Y. 2016) ("Such a bare allegation is far too vague and bereft of specifics to plausibly allege a claim of disparate treatment on the part of the Defendants in assigning [overtime] hours."), *aff'd in part, vacated in part on related grounds, remanded*, 676 F. App'x 51 (2d Cir. 2017) (summary order); *cf. Almontaser v. N.Y.C. Dep't of Educ.*, No. 13 Civ. 5621 (ILG), 2014 WL 3110019 (E.D.N.Y. July 8, 2014), at *8 (rejecting hostile work environment claim where allegations were "simply too vague," leaving court unable to "conclude that plaintiff's work environment was objectively hostile").

Stripped of these generalized claims, the SAC alleges little more than that Daniel's supervisor, Gayle, was put off by Daniel's frequent but unfounded allegations of discrimination: In response to Daniel's many such complaints, the SAC alleges, Gayle stated that it was "only the Nigerians [who] complained and he did not know why it was difficult to satisfy them," SAC ¶ 54; that "he does not discriminate and that it was the Nigerians at ACS that always complain about overtime and that the situation will not change to satisfy the Africans," *id.* ¶ 21; that "he does not understand why Nigerians are so persistent and causing confusion," *id.* ¶ 34; and that Daniel should go "to go to the [EEOC] if he wants," an effort Gayle viewed as a "waste of time," *id.* ¶ 22.

Gayle's commentary in response to Daniel's complaints of discrimination based on his national origin does not validate those claims as plausible. These rejoinders do not plausibly allege that Gayle denied Daniel overtime *because* of his nationality. *See Erasmus v. Deutsche Bank Americas Holding Corp.*, No. 15 Civ. 1398 (PAE), 2015 WL 7736554, at *9 (S.D.N.Y. Nov. 30, 2015) (dismissing discrimination claim where complaint "nowhere suggest[ed] that the defendants engaged in such actions *because of* Erasmus's membership in a protected class") (emphasis in original); *Humphries v. City Univ. of N.Y.*, No. 13 Civ. 2641 (PAE), 2013 WL

6196561, at *6 (S.D.N.Y. Nov. 26, 2013) (same, where plaintiff failed "'to plead any facts that would create an inference that any adverse action taken by any defendant was based upon' the protected characteristic") (quoting *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007)).  Had Gayle made repeated and unprompted statements about Daniel's national origin, such might well have plausibly supported an inference of discriminatory intent.  But, critically, here, all such comments, as pled, were in response to Daniel's allegations—and denied them.  To the extent the allegations in the SAC speak to Gayle's reasons for denying Daniel overtime, they do not concern his nationality.  *See, e.g.*, SAC ¶ 29 ("[T]he overtime pool was reduced as the backlog of cases became decongested.").

Two other allegations in the SAC, in contrast, plausibly suggest bias by Gayle on the grounds of national origin.  Specifically, on unspecified dates more than a year apart, Gayle allegedly stated that (1) "he wished not to supervise the lazy and troublesome Africans[,] especially Amechi Daniel," *id.* ¶ 51, and (2) "Africans who are backward come to America and lay claims to rights they do not have in their countries of origin," *id.* ¶ 55.  However, as pled, these remarks are untethered to the denial of Daniel's requests for overtime work.  It is not alleged that these remarks were made, in any way, in conjunction with such denials or around the time of such denials.  And "stray remarks alone do not support a discrimination suit." *Ahmad v. White Plains City Sch. Dist.*, No. 18 Civ. 3416 (KMK), 2019 WL 3202747, at *5 (S.D.N.Y. July 16, 2019) (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998)); *see also Luka v. Bard Coll.*, 263 F. Supp. 3d 478, 487 (S.D.N.Y. 2017) ("Isolated comments, while potentially offensive, do not lead to an inference of discriminatory intent."); *Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 167–68 (E.D.N.Y. 2015) (holding that "two remarks referencing [the] Plaintiff's national origin and age" are "the very definition of what constitutes

15

'stray remarks' under employment discrimination law") (citations and some quotation marks omitted).

### b.  Similarly Situated Employees

Daniel also argues that discriminatory motivation may be inferred from the fact that a non-Nigerian co-worker, Grant, was given the opportunity to work overtime shifts.  "A plaintiff may support an inference of . . . discrimination by demonstrating that similarly situated employees of a different [nationality] were treated more favorably," but "[i]n order to make such a showing, the plaintiff must compare herself to employees who are 'similarly situated in all material respects.'"  *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999) (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)); *see also Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003); *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  "[S]imilarly situated in all material respects does not mean all respects generally, but rather sufficiently similar 'to support at least a minimal inference that the difference of treatment may be attributable to discrimination.'"  *Hernandez v. City of New York*, No. 11 Civ. 3521 (SJ) (RER), 2013 WL 593450, at *4 (E.D.N.Y. Feb. 13, 2013) (quoting *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001)).

The SAC, however, does not allege facts that enable any meaningful assessment of whether Grant is similarly situated to Daniel in all material respects, so as to potentially support the inference that the denial of overtime opportunities to Daniel bespoke discriminatory animus. It instead vaguely repeats that Grant was approved for an unspecified number of overtime shifts while requests by Daniel were denied.  For instance, the SAC states that although Gayle denied 11 of Daniel's overtime requests times in 2019, "Grant was however allowed to do overtime." *See* SAC ¶ 58.  It does not, however, supply any details about Grant's requests (*e.g.*, their

volume or timing) or any facts bearing on her suitability for overtime work (*e.g.*, her level of experience, work evaluations, and availability) relative to Daniel. Absent such context, and without more, it is conjectural to claim that the basis for Gayle's denial of Daniel's overtime requests was his Nigerian national origin, as opposed to benign considerations.

Critically, too, the SAC does not allege that all of Grant's overtime requests were granted, *see id.* ¶ 40 (alleging that Grant's overtime requests were approved only "for the most part")—or that all of Daniel's requests were denied. On the contrary, in an allegation in seeming tension with Daniel's claim that Gayle was driven by bias to deny his overtime requests, the SAC suggests that Daniel did receive *some*—just not all—overtime shift opportunities. *See, e.g.*, *id.* ¶ 24 (alleging only that Daniel was "often denied" additional overtime shifts). And to the extent overtime opportunities in the Unit were denied, the SAC supplies a non-discriminatory, systemic, explanation. *See id.* ¶ 29 ("[T]he overtime pool was reduced as the backlog of cases become decongested."). The SAC's allegations thus fall well short of plausibly alleging that Grant was "similarly situated to [Daniel] 'in all material respects,'" *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 494 (2d Cir. 2010) (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)), let alone that her (sometime) receipt and Daniel's (sometime) denial of overtime opportunities bespoke anti-Nigerian discrimination.

Significantly, too, the SAC is virtually silent about how the other members of the Unit fared with respect to overtime opportunities. As pled, the Unit's four Child Care Specialist Supervisor IIs included another person, besides Daniel, of Nigerian descent (Pedro) and another person besides Grant who was not (Barnette). These demographics, potentially, provided fodder for a more systematic assessment with respect to Gayle's record regarding work peers' overtime requests. *See Mandell v. Cnty. of Suffolk*, 795 F.3d 368, 379 (2d Cir. 2003) (sustaining claim

where allegations compared plaintiff to numerous similarly situated co-workers). But the SAC does not undertake this effort, stating only that "none of the[] Nigerians was granted the expansive overtime opportunities that Mr. Devon Gayle approved for Ms. Brigitte Grant." SAC ¶ 39. That generalization is too threadbare to make plausible Daniel's claim of a discriminatory denial of overtime.[8]

In the end, the SAC's claim of a discriminatory denial of overtime reduces to little more than the allegation that because an unwanted circumstance (insufficient overtime opportunities) befell Daniel at work and because he is Nigerian, the former must have caused the latter. That causal inference, without more, does not follow. *See House v. Wackenhut Servs., Inc.*, 10 Civ. 9476 (CM) (FM), 2012 WL 4017334, at * 1 (S.D.N.Y. Aug. 20, 2012) ("[Plaintiff's] complaint, like entirely too many employment discrimination complaints seen in this Court, does nothing more than allege the familiar faulty syllogism: something bad happened to me at work; I am (fill in the blank with one or more protected categories); therefore it must have happened because I am (fill in the blank with the applicable protected category/ies."); *Benjamin v. Consol. Edison Co. of N.Y., Inc.*, No. 14 Civ. 9230 (CM), 2015 WL 5671760, at *3 (S.D.N.Y. Sept. 22, 2015) ("[I]t is not enough for a plaintiff in an employment discrimination case to allege, *post hoc ergo propter hoc*, that, 'I am an older person; bad things happened to me at work; therefore, they must have happened because I am an older person.'").

The Court accordingly dismisses Daniel's claim under Title VII of discrimination on account of his national origin. *See Ahmad*, 2019 WL 3202747, at *7 (dismissing discrimination

---

[8] The SAC also faults Gayle for instructing the staff, with the exception of Grant, "to move to a new location against the[ir] wishes." SAC ¶ 34. That general allegation does not support an inference of anti-Nigerian animus, including because, as pled, persons of non-Nigerian heritage such as Barnette were also affected by it.

claims where complaint failed to plausibly plead discriminatory intent); *Thompson v. New York City*, No. 12 Civ. 8034 (PAE), 2013 WL 6409326, at *10 (S.D.N.Y. 2013) (dismissing discrimination claims where, *inter alia*, complaint was "woefully unspecific about . . . proffered comparators" and failed "to state facts that would allow a court to infer [plaintiff] was treated differently based on [a protected characteristic]"); *Humphries*, 2013 WL 6196561, at *8 ("In effect, the Amended Complaint tars [defendant] as a racist and sexist without alleging any factual basis for these labels.  Such purely conclusory allegations of discrimination, absent any concrete particulars would fail to establish a prima facie case.").

### C.  Retaliation Claims under Title VII

#### 1.      Legal Principles

Retaliation claims under Title VII are also analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 330 (S.D.N.Y. 2020) (citation omitted).

To state a *prima facie* case, a plaintiff must present evidence that shows "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 316 (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).  The plaintiff's burden of proof at the *prima facie* stage is "*de minimis*." *Hicks*, 593 F.3d at 166.  If the initial burden is met, "a 'presumption of retaliation'" arises, which the employer "may rebut by 'articulating a legitimate, non-retaliatory reason for the adverse employment action.'" *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (brackets omitted) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).  If the employer provides such a reason, "the presumption of retaliation dissipates," and

the burden shifts back to the plaintiff to prove "that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* (citation omitted).

"As with discrimination claims, at the motion to dismiss stage, 'the allegations in the complaint need only give plausible support to the reduced *prima facie* requirements that arise under *McDonnell Douglas* in the initial phase of . . . litigation.'" *Farmer*, 473 F. Supp. 3d at 331 (quoting *Duplan v. City of N.Y.*, 888 F.3d 612, 625 (2d Cir. 2018)).  For a retaliation claim to survive, "the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) because he has opposed any unlawful employment practice." *Duplan*, 888 F.3d at 625 (citation omitted).  "As for causation, a plaintiff must plausibly plead a connection between the act and his engagement in protected activity." *Vega*, 801 F.3d at 90.  The desire to retaliate must have been a "but-for" cause of the adverse employment action. *See Lively*, 6 F.4th at 304 (but-for causation requirement applies to Title VII retaliation claims).

### 2.    Application

Like his discrimination claim, Daniel's Title VII retaliation claim is based exclusively on Gayle's denials of his overtime requests.[9]  He alleges that Gayle refused to grant overtime requests of his because he had earlier complained about Gayle's allegedly discriminatory allocation of overtime works.

---

[9] The SAC does not allege that Gayle's use of an August 2018 start date for the initiative rolled out in October 2018—a date Daniel viewed as disadvantageous given his August vacation—was an act of retaliation.  Nor does it allege retaliation with respect to Gayle's relocation of Daniel but not Grant.

For purposes of the instant motion, the parties do not dispute that Daniel complained about "unlawful employment practices" and that Gayle's denials of overtime requests were "adverse employment actions." Mot. at 19.

The SAC, however, does not plausibly plead a nexus between Daniel's complaints and Gayle's ensuing denials of overtime requests, let alone that a "desire to retaliate" was a but-for cause of those denials. The SAC pleads that Gayle voiced frustration at complaints by Nigerians (presumably, at least, Daniel) about the allegedly discriminatory allocation of overtime. But it does not allege, other than conclusorily, that these complaints prompted a new round of denials of overtime for Daniel. At one point, as alleged, "Gayle told [Daniel] not to bother requesting overtime because it would be denied." SAC ¶ 33. But the SAC is devoid of facts supporting that Gayle's resistance to awarding Daniel overtime opportunities derived from his prior complaints. There are no allegations of statements to this effect by Gayle, nor any allegations that the timing of overtime denials sufficiently proximately followed his complaints as to suggest causation. Daniel has thus not carried his burden to "plausibly plead a connection between the act and his engagement in protected activity." *Vega*, 801 F.3d at 90.

At most, the SAC quotes Gayle as stating, of Daniel, that "he had no right to speak about overtime discrimination and work assignment the way he did and if he continued he would be subject to discipline." SAC ¶ 48. But Gayle allegedly made that comment in June 2018, and the SAC does not allege even a single specific time that Daniel was denied an overtime shift in the balance (six months plus) of that year. Whatever inference might have arisen had Daniel been denied overtime shortly after that statement is sapped by the long time that passed thereafter without an alleged denial of overtime. *See Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) ("This Court . . . has consistently held that proof of causation can be shown . . . by

showing that the protected activity was followed closely by discriminatory treatment."); *Jackson v. N.Y. State Off. of Mental Health*, No. 11 Civ. 7832 (GBD) (KNF), 2012 WL 3457961, at *11 (Aug. 13, 2012) ("Generally, courts in this circuit have held that the temporal nexus between the protected activity and the adverse employment action must be three months or less to establish a causal connection.") (collecting cases).[10]

The SAC therefore fails adequately to plead that Daniel suffered an adverse employment action because he had engaged in a protected activity. On the contrary, as noted, allegations in the SAC supply plausible bases for Daniel's overtime denials unconnected to his national origin. *See* SAC ¶¶ 29 ("[T]he overtime pool was reduced as the backlog of cases become decongested."), 48 (alleging that Gayle stated that Daniel "did not do much reactivation" and "did the least work in the unit" and "had no right to talk about overtime discrimination and work assignment the way he did"). The Court accordingly dismisses Daniel's retaliation claim under Title VII.

### D. Claims Under the NYSHRL and the NYCHRL

Having dismissed all of Daniel's federal claims, the Court must determine whether to exercise supplemental jurisdiction over his remaining claims, which allege discrimination, retaliation, and a hostile work environment under the NYSHRL and NYCHRL. Federal district courts have supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, such jurisdiction is discretionary, *see City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997), and a

---

[10] The Court also notes that, for the reasons described *supra* Section III.A, conduct before February 4, 2019 cannot alone, under Title VII, be the basis for liability.

district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c)(3).

In deciding whether to exercise supplemental jurisdiction, a district court is to balance the traditional "values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).  Both the Second Circuit and the Supreme Court have held that, as a general rule, "when the federal claims are dismissed the 'state claims should be dismissed as well.'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

Had the SAC's federal claims proceeded past the motion to dismiss stage, there would have been a basis in judicial economy for the Court to exercise supplemental jurisdiction over Daniel's NYSHRL and NYCHRL claims, as these arose from the same facts as those underlying the federal claims.  But the federal claims have been dismissed at the threshold.  And the dismissal of those claims does not necessarily dictate the dismissal of his NYSHRL and NYCHRL claims, so as to favor reaching those claims in the interest of economy.  As to Daniel's claims of a hostile work environment claims, the Court has not had occasion to consider such a claim under Title VII, because Daniel did not bring such a claim before the EEOC and therefore did not pursue it in this Court.  And the substantive standards governing Daniel's discrimination and retaliation claims under Title VII differ from those under the NYCHRL, *see Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 31 (App. Div. 1st Dep't 2009)) ("[C]laims under the City HRL must be reviewed independently from and 'more liberally' than their federal and state counterparts."); N.Y. Exec. Law § 300; and in a light of a recent statutory amendment may, to the extent Daniel's NYSHRL claims rely on conduct after August 2019, differ from those under the NYSHRL.  *See*

*McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68–69 (S.D.N.Y. 2020) ("In August 2019, the NYSHRL was amended to construe the NYSHRL, like the NYCHRL, [liberally].")

For these reasons, the Court, having resolved the SAC's federal law claims and found them not viable, does not find any circumstances counseling in favor of the Court's exercising supplemental jurisdiction over Daniel's remaining claims. The Court accordingly declines to exercise supplemental jurisdiction over the SAC's NYSHRL and NYCHRL claims, and dismisses these without prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants the City's motion to dismiss the SAC's federal claims. That dismissal is with prejudice, as the SAC was Daniel's third complaint, and he has not identified any factual basis on which these claims may be rehabilitated. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). The Court declines to exercise supplemental jurisdictional over Daniel's NYSHRL and NYCHRL claims. These claims are dismissed without prejudice.

The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 14 and 20, and to close this case.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: December 16, 2021
       New York, New York